The next three cases on the calendar this morning have been submitted. The next case for argument is Bugielski v. AT&T Services, and counsel are here in person. Mr. Nestico? Thank you, Your Honor. My name is John Nestico with the firm of Schneider Walsh Cottrell Konecki on behalf of Plaintiff Appellants, and I will beg your indulgence this morning for struggling through yet another ERISA case. I know my wife falls asleep every time I mention the term deferred compensation, but this is an important case dealing both with a breach of fiduciary duty for allowing a planned service provider, in this case Fidelity, to continuously receive excessive compensation for their services and the failure of the planned fiduciaries to adequately evaluate the amount of that compensation in relation to the services being provided. We're appealing a number of rulings from the district court that we feel were in error. First, despite finding that Fidelity's compensation from financial engines and brokerage link was, in fact, subject to the 408b2 disclosure regulation, the court ruled that AT&T had no duty to evaluate that compensation. That is completely contradictory since the whole purpose of the 408b2 rule is to obtain disclosures of all the compensation received by the service provider and evaluate the reasonableness of that compensation. What do they do with that information? What are they supposed to do with it? They're supposed to negotiate lower fees. Okay. So which transaction did they fail to negotiate a lower fee? Two transactions, Your Honor. One, the first one, and it's been in place for quite a long time, is the transaction with Fidelity for providing self-directed brokerage services, 401k plans in general offer. So when did that come about in the timeline? That's not exactly clear, Your Honor. However, defense counsel in their brief indicated that it was around the 2012 year. I think it was a little bit earlier than that because the 2009 5500s report that brokerage link was part of the plan. Tell me again when the original contract was. Original contract was from 2005. 2005. So they arranged with Fidelity to be the record keeper. And then in 2000 and what? 2012? Well, Your Honor, I think defense counsel indicated it was 2012. As I said, I believe it was earlier than that. But the date actually — So did AT&T plan administrators have to sign off on that arrangement? Yes, Your Honor. They did. So did they negotiate — In fact, it became part of the Fidelity contract. Does that signing off qualify as a transaction under the 408? It was — I believe it does, Your Honor. It was a separate transaction. In fact, the 408B2 rule became effective on July 1st, 2012, and the Department of Labor made it absolutely clear that every contract for services that was in existence at that time had to provide the disclosures required by the rule, and the plan fiduciary was required to evaluate those disclosures. So when that transaction took place, your theory is that AT&T plan administrators had to say to Fidelity, look, you're going to get all this money, this shared money, and we think you ought to reduce our record-keeping fee. Yes, Your Honor, that's correct. Is that kind of how it works? Yes. And in fact, AT&T admitted that in a letter to Fidelity in January of 2012 in advance of the effectiveness of the 408B2 regulation. In that letter, it said, in summary, ERISA 408B2 exempts certain agreements between plans and service providers that are otherwise prohibited if the requirements of this section are met. The amendments to 408B2 establish a new requirement that a covered service provider must disclose specified information to a responsible plan fiduciary as outlined in the rule. If the information is not provided, the agreement between the plan is not reasonable and the letter from plan assets constitutes a prohibited transaction. That was the letter from AT&T to Fidelity. Now there was a 2000 and their 2011 agreement with Fidelity. That agreement expressly states that AT&T plans will receive no credit for the brokerage loan services. Let me just go back. I just want to clarify one point. And as I understand your argument, you don't contend that the initial contract with Fidelity qualifies as a prohibited transaction. Well, no, Your Honor, not at the time, but even the original contract was required to provide the disclosures in 2012 when 408B2 became effective. Right, but I mean, not when they first negotiated the original contract. That's correct. We're not claiming that. They needed a record keeper. That's correct. So then they start off and then as we move down the line, these events happen. Right. And we claim the same thing with respect to the financial engines agreement, which took effect in 2014. And did AT&T plan administrators have to sign off on that? Yes, they did, Your Honor. How did they sign off? They entered into a separate agreement with financial engines and they amended their existing agreement with Fidelity to include the financial engines requirements that Fidelity provide access to financial engines to participants' accounts in order for financial engines to perform their services. Is that also a separate agreement? That is a separate transaction, Your Honor. Is it documented? Yes, it is documented. There's a separate agreement with financial engines and, as I say, amendments to the AT&T Fidelity agreement to accommodate the financial engines agreement. And again, that was the 408B2 rule applied to all existing contracts in existence in July 2012, all extensions and renewals of those contracts, and any new contract entered into after that date. I see. Now, we also have claimed that the overall fees that Fidelity was paying or that AT&T was paying to Fidelity, even without consideration of the millions of dollars in compensation they were receiving from financial engines and brokerage link, were excessive. But — That seems like a harder claim. That is a harder claim, Your Honor, no doubt. The district court erred in taking the defendant's position that the only fee that should be that ranged from $30 to $20, but that completely ignored $9.5 million, for example, in 2017 that was paid under the Fidelity contract for a variety of other administrative services required by the plan. The 408B2 rule in the DOL has made it absolutely clear that a fiduciary has to consider all of the compensation and not just a piece of it. And it doesn't make sense otherwise, because you could negotiate a really low per-participant fee and then charge excessive fees for distribution and other services. I have one other question along the line of which transaction is really the one that counts, or transactions. How about when they renegotiated the contract, what was that, in 2018? Is that — Yes, Your Honor. — when that took place? Is that within the realm of a prohibited transaction? Yes. That's a renewal or an extension of an existing contract, and covered by 408B2. Now, of course, in 2018, the fees were substantially reduced, which also might lead one to question why they weren't reduced sooner than that, because there were substantial reductions in 2018. The total fees went from $16 or $17 million a year to around $8 million a year, as I recall. Why do you think that was? Well, I think because the fiduciaries may have woken up and decided to negotiate lower fees. But they still were not permitted to take into account the $3 or so million a year they got from brokerage link, because that contract continued to say AT&T plan would get no credit for that compensation. And of course, by then also, the financial engines fees and fidelity share of the financial engines fees had dropped significantly as well. Could we just assume for a moment that you prevail here? I don't know. I'm just assuming because I want to know what's going to happen if there were to be a reversal here and it goes back to the district court. What would happen? I mean, what would you have to prove to prevail? Well, we'd have to prove just what we're saying now, that AT&T failed to take into account that compensation. And as you may know, a breach of fiduciary duty claim really depends on process. So what we're claiming is that AT&T completely failed to accept or adopt a process that was reasonably designed to evaluate the reasonableness of those fees. Don't you have to prove some damage to the plan? Pardon me, Your Honor? Don't you have to prove damage to the plan? Yes. Well, the damage, Your Honor, would be the excess of the fee over what should have been a reasonable fee. Take the financial engine's share of the fee, for example. AT&T did not stop to consider how much it was. Even when it was presented to John Phipps, it looked like Fidelity was going to receive more of the total financial engine's fee than financial engines would receive for providing the investment advice. On top of that, when you think about it, every plan on the Fidelity platform that uses financial engines is paying the same fee to Fidelity for the same connection that financial engines makes to the Fidelity system. So financial engines only needs one access to the system that covers the thousands of plans in the Fidelity platform. So they're collecting 100 times or 1,000 times for the same service that they're providing to financial engines. So AT&T makes a big argument or expresses what I thought was some concern, legitimate, I think, that you didn't have an expert. Well, Your Honor, I think that's true. And I suppose in retrospect, I would have preferred having the expert. But at the same time, we're talking about a legal requirement on behalf of the planned fiduciary to obtain the disclosures. Fidelity has never obtained from, I'm sorry, AT&T has never obtained from Fidelity the amount of compensation it's receiving from Brokerage Link. They did receive a disclosure finally in 2018 that indicated what the revenue sharing payments were from the mutual funds. But the only record evidence is that that's the first time that Fidelity actually provided any information to AT&T about the amount of those fees. So AT&T disclosed a report by Deloitte about the fees, but we can't find it anywhere in the record. Was that introduced in the district court? That was introduced in the district court, yes, Your Honor. Our position is that we haven't specified this, but that report on its face is also flawed because of its limitations. That report only took into account the per-participant fee and assumed by its terms that the fee there were no other charges for record keeping when, again, the 5,500 indicates for 2017, for example, that the plan paid an additional $9.5 million to Fidelity for services. So our position about that is that the Deloitte report was flawed as the district court ruling was because it focused only on the per-participant fee and it didn't take into account a lot of other compensation and certainly did not take into account compensation from financial engines or brokerage link. Your argument is bottom line, if they had done what they were supposed to do and take all the fees into account, your clients would be paying a lot less money. Yes, Your Honor, that's exactly right. That's how they were harmed. And that's the purpose of the rule. The whole regulatory scheme, and this gets to the reporting as well, so we've claimed that AT&T failed to report that compensation, indirect compensation to Fidelity on the plan's 5,500. But the whole reporting scheme for ERISA is critical to the operation of ERISA. The DOL has made that pretty clear over and over again. The 5,500s are based on audited financial statements of the plan and trust. So there are no taxes that are due for filing this report. It's only an informational report. And it's filed on a publicly available website so that anybody can look at it. And the whole point of it is so that plan participants, plan sponsors, lawyers, other service providers can examine these 5,500s and know exactly what all these plans are paying for what services and then use that information to obtain the best deal they can get. So how do you respond to cases from other circuits that seem to take a position opposite to yours, SUEDA and the Oshkosh case? Oshkosh, SUEDA, and Marshall, which is relied on heavily by the defendant, did not even mention 408b2. So they didn't take it into account at all. And again, it's clear that even as admitted by AT&T in its letter to Fidelity that 408b2 requires these disclosures, requires evaluation of the compensation. And if that process does not occur, then the contract is not reasonable within the terms of the statute and constitutes a prohibited transaction. None of those cases addressed 408b2 at all. Did you wish to reserve some time for rebuttal? Yes, Your Honor. Just a minute or two would be fine. Thank you. You have a little over a minute. Ms. Johnson. Yes. Thank you, Your Honor. May it please the Court, Ashley Johnson for the AT&T appellees. I want to take a step back and talk about what the contract with Fidelity was. Employee benefit plans like AT&T's plan here often contract with third parties like Fidelity to perform a number of record-keeping services, track participant contributions, track investments, perform other administrative tasks. Fidelity was not only doing record-keeping services. That's why when you look at the Form 5500s, it reveals that the most recent ones show there was compensation for record-keeping and administrative tasks. There was also direct compensation to Fidelity for separate tasks such as brokerage commissions. And all of those things appear on the Form 5500 if they're direct compensation. Not everything on there is record-keeping fees. So I want to start with the 408B arguments that the appellant is mostly focused on. The reason that cases like Oshkosh and Sueda and Marshall do not apply 408B2 is because they conclude that it does not apply to arm's-length record-keeping agreements like the one here. Where's that in the statute? So the statute that's relevant is Section 406A. And 406A has broad language that, if you read it literally, could reach basically any agreement with any service provider. So where you have to go to understand what was prohibited by 406A is to Lockheed v. Fink, which is the Supreme Court decision where the Supreme Court took a look and said, okay, what do we think is really prohibited by 406A? And the Supreme Court said, everything under 406A, we're going to read it against the understanding that these are, quote, commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's-length. And so the Supreme Court said, even if something falls within the plain, most expansive literal language, we construe Section 406A to be about plan insiders, non-arm's-length transactions. And so applying Lockheed v. Fink here, that's what Sueda did, that's what Oshkosh did. The Third Circuit and the Seventh Circuit said, when you have an arm's-length agreement, your record-keeping agreements are good for members of the plan. They allow AT&T to receive these services at a more often-affordable rate. In your view, a contract like this can never be a prohibited transaction under 408? It can't be a prohibited transaction under 406A unless it involves non-arm's-length or the language that Sueda applied was there's an intent to confer some sort of benefit on the service provider. So if you had some sort of close relationship, a friendship, somebody's brother ran the service provider. When you have a record-keeper like Fidelity here, this basic transaction, in your view, 408B doesn't apply? Or it only applies when there's an insider misconduct kind of situation? That's right, because what 408B2 is is a description of exemptions to 406A. It seems like you'd have to rewrite the statute a bit to come to that conclusion. I think you just have to read the statute against the context in which it was enacted and the goal of making sure that plans are not entering into transactions that are likely to harm them. And that's what the Supreme Court, Lockheed was actually a 7-2 decision, because the Supreme Court said we're comfortable with what ERISA was intended to do and what 406A specifically is intended to do. Now, of course, it's not like that leaves plan participants without a remedy if there's something actually wrong with the record-keeping agreement. So if, for example, the appellants had presented evidence that the record-keeping fee was too high, which they have failed to do, then they could have proceeded past summary judgment on that evidence that the record-keeping fee was too high. Well, what happens to the indirect compensation? So indirect compensation, there's two types of indirect compensation. Some of it is eligible indirect compensation that is not disclosed in the Form 5500. Other indirect compensation could be disclosed if it was a different type of indirect compensation. We just don't have that here. But the indirect compensation is disclosed. If you're in a world where you're looking at 408B2, which we would say we're not here, then Fidelity discloses to AT&T the basics of its indirect compensation, the fact that it is receiving it and the fee structure that it has. And so that information was disclosed from Fidelity to AT&T so AT&T could take it into account. And there's unrebutted evidence in the record from John Phipps, who was AT&T's witness, that, in fact, AT&T did take into account the fact that Fidelity was receiving additional compensation for other services, not record-keeping services, but other services from Financial Engines and from its brokerage link. And that is part of why AT&T has such a very low record-keeping fee. It started at $31 in 2011, the beginning of this class period, and it worked its way all the way down to $20 because AT&T was able to continually negotiate it down, which is, of course, the hallmark of a prudent process. So when it was negotiated down, was it negotiated down because Fidelity was getting these indirect... Indirect compensation. For example, I mean, Fidelity said in its brokerage link arrangement that wouldn't be credited against or wouldn't be used against Fidelity. I mean, what is that all about? Well, to understand that, I think you have to take a step back. Sueda talks about there's two different ways, broadly speaking, that people compensate their record-keeper. One is a flat fee where the plan just pays a flat fee per participant. That's what AT&T does. Another is where part of the record-keeping fee comes from this outside payments from mutual funds. That's like what happened in the Tussey decision from the Eighth Circuit, which is one that was talked about in Marshall. In that sort of situation, then the person in AT&T's position, the plan administrator or the fiduciary, has to keep an eye on what those other record-keeping fees are to make sure that the total record-keeping fee isn't ending up high. So in our situation, what that language does in the contract that you referred to is makes it clear that these fees are separate. There are record-keeping fees that AT&T pays that AT&T makes sure are reasonable. And then Fidelity may receive other fees and does receive other fees from other service providers or from brokerage link. But what the contract does is it keeps those separate, and it makes clear that that's not part of the record-keeping fee. Now, the appellants haven't really challenged any of those fees, which I think is an important point. It's not like they're saying that Financial Engines charges AT&T a price that is above market and that they have evidence of that. And they're not saying that the brokerage fee schedule that Fidelity charged was above market and they don't have any evidence of that. Instead, we're kind of operating on an assumption that what AT&T paid Fidelity alone is a very good price. That's what the Deloitte report says, and there's no evidence to the contrary. And then what was paid to Financial Engines by AT&T, there's no evidence at all that that's not a good, fair market or below market price. What they're really challenging is the fact that Financial Engines gave some of that to Fidelity, but that doesn't take money out of AT&T plan participants' pockets. And so a lot of what appellants' counsel said is just speculation about how much it ought to cost Fidelity to provide services to Financial Engines. AT&T is not in that relationship. We're not providing those services. And then the speculation about whether or not if Financial Engines paid Fidelity less, what that would do to AT&T's fees, there's no evidence of that either. There's no evidence in the record. What struck me about this is that Fidelity and Financial Engines, they both benefit from their work with the plan. And it seems like the plan should get some benefit from that too. I mean, the plan participants do benefit from the work Fidelity does and the work Financial Engines does. From the fees. From which fees? The fees that Fidelity gets from Financial Engines. Right. So basically, Fidelity is providing services to plan participants. Financial Engines is providing services to plan participants. But Financial Engines can't provide those without some technological assistance from Fidelity. That all comes from the plan, correct? The whole arrangement exists because the plan exists for the participants. Right. So the plan participants need the benefit of the service they are purchasing from Financial Engines. But one of the costs that Financial Engines has to incur in order to be able to provide that is purchasing the technology capabilities and other services from Fidelity. And so it's really no different from the plan participant's standpoint than if Financial Engines was buying something from a third party. Financial Engines needs to pay out money to be able to provide the service that the plan participants desire and have opted for. And again, if there were something going on about this transaction or series of transactions that made them problematic, you would expect to see a challenge to the size of the payment from AT&T to Financial Engines and evidence that other plans are able to get a lower price from the plan to Financial Engines. Because absent that evidence, there's no reason to think that there's anything. I mean, the market is going to force these prices. The market, absent some sort of evidence of something else going on, you would expect that Fidelity would receive from Financial Engines what the value of those services are and then Financial Engines would charge to AT&T. But there's not any expert evidence or any evidence, really, that any of those prices, either from Financial Engines to AT&T or from Financial Engines to Fidelity, are anything other than what you would expect in a competitive process. So you don't really mention the supplementary information for 408. Is that your position, because 408 just doesn't apply? Because some of the examples that are in that information seem right on point, talking about fees from brokerage firms that would suggest that this should be indirect compensation that should be considered in the AT&T Fidelity contract. So we do argue, kind of in the alternative to 408B not applying, that the type of disclosures that are required by 408B2 were provided or were given from Fidelity to AT&T. And so those appear in the record, the ones for brokerage link, at two excerpts of record, 200 to 202. And then from Financial Engines, five excerpts of record, 1031 and 1035. Those are the disclosures that would be required if 408B is applicable. And so we have provided those disclosures. And that's the reason, obviously these cases swayed as a 2019 decision. Oshkosh is just from a couple of months ago. And so AT&T and Fidelity have been acting as if these things need to be disclosed, and they have been disclosed. It's just that as courts have followed Lockheed and construed 406A in the aftermath of Lockheed, courts of appeals have started to say actually 406A is more limited than it had, you know, some people had understood it to be. So I asked your opposing counsel about the Deloitte report. Not only could we not find it in our record, the district court wasn't able to procure a copy for us. So is that in the record somewhere? Has that been introduced? There is a PowerPoint that summarizes the findings of the Deloitte report that I believe is from Deloitte. So I can look and see what the excerpt, I mean what the excerpt of record site is and submit that for the court. That document you just described, the PowerPoint document, it was submitted to the district court as an exhibit? Yes. The one I'm thinking of. And so maybe there's a reason that there's not a thorough like, you know, written out report. But the one that I'm thinking of is an excerpt of record, and so it was in the district court. Right. Sometimes when counsel make the excerpts of record, they fail to include exhibits that they never quite understood. But that's changed under our rules. Right. So... The 404A argument, the argument about prudence, I'll just touch on briefly because I think, as the appellants acknowledge, it is a much harder argument. Well, I think they're both hard arguments, but it is a hard argument for them because you would expect, and the Marshall Court looked for, expert evidence that, of what would be, what a prudent fiduciary would do. And that's the first thing, because it's about process. And so you should have some evidence that a prudent fiduciary takes into account in negotiating a recordkeeping agreement, what other compensation the recordkeeper is getting, and then negotiates down the recordkeeping fee accordingly. There's not any evidence of that. There's also not any factual evidence in the record that suggests that any other fiduciary, any other company or any other plan does the sort of leveraging of outside fees for different services and decreasing recordkeeping fees that the appellants are looking for. As I mentioned earlier, it is in the record, nonetheless, that Mr. Phipps testified that AT&T's awareness of those other fees and the profit fidelity was taken into account by AT&T in negotiating down those recordkeeping fees over time. But in order to establish the standard of care for a prudent fiduciary and show that AT&T falls short of it, you're going to need some sort of expert testimony to establish what that standard of care is. And that goes back to the trust principles underlying ERISA. Let me ask you this. Without an expert, does that claim just fail? It's hard. Or, you know, when he gets to trial, who knows what would happen, if he could get to trial? Their particular claim fails without an expert because theoretically, if you had some sort of strong factual evidence that said I've done discovery of 12 other plans and gotten their process and all of them negotiate down the recordkeeping fees by use of other fees, in theory, perhaps you could overcome the lack of expert evidence with some strong factual evidence. But when they have neither factual nor expert evidence that AT&T did not... I thought there was some evidence. I forget who it was on the AT&T side, but there was some testimony at one of the depositions that they didn't really consider the indirect fees. It was not that. What the testimony is that the appellants rely on is that AT&T was not aware of the terms between financial engines and Fidelity. It did not influence those terms. It did not control them. It viewed them as out of its control. That's different from Mr. Phipps' testimony about what AT&T did with its knowledge of the existence of those fees, which is negotiate down the recordkeeping fees because of the value that Fidelity was getting. Thank you, Your Honors. Thank you. Mr. Mistico. Yes. Thank you, Your Honor. I'll try to be as brief as possible. First, if those cases really intended to put a gloss under 408b2, they were pretty quiet about it because there was not even a mention of 408b2 in the cases. And I think when you look at the regulatory scheme, the AT&T letter to Fidelity, that position about the statute is just flatly wrong. And plus, when you look at what happened with the implementation of 408b2 in July of 2012, every single service provider to every single plan had to comply with the 408b2 disclosure rules, and those plan fiduciaries had to make a determination that the disclosures represented reasonable compensation. So to say that there's some sort of arm's length gloss on this is just flatly wrong, and it's a standard that would be impossible to apply. Secondly, these are not arm's length transactions. AT&T has contracts with Fidelity to cover virtually all of their plans, their defined benefit plans, their multiple 401k plans. They had an agreement to provide recordkeeping services. And when AT&T decided they wanted to add the brokerage link account, what were they offered? They were offered Fidelity's brokerage link and not some other self-directed brokerage service. So that, to me, is sort of a self-dealing transaction. And as it turns out, Fidelity's getting substantial amount of compensation from brokerage link. The same thing happened when AT&T wanted to have a managed account service. They were offered two choices, the Fidelity Portfolio Advisory Service and the Financial Engine Service, and AT&T had an exclusive arrangement with Financial Engines to be, other than Portfolio Advisory Service, the sole managed account provider on their platform. So those are not what I would consider to be arm's length transactions. Secondly, or thirdly, there are multiple cases in other jurisdictions, including this one, and we cite to a case at our reply brief, I believe, on page 26, where the Ninth Circuit has rejected the idea that there's some sort of arm's length gloss on prohibited transactions. The congressional record is fairly clear that these transactions were identified because they have the propensity to have some self-dealing involved with them, and that's why they were prohibited, unless you satisfy one of the exemptions. So you are over time. Thank you. Thank you very much. Thank you, Counsel Wolf. Submit the case.
judges: PAEZ, BADE, Collins